Next case on today's docket is the case of Schellenger v. Midland Funding, LLC et al. And we have Mr. Edelman for the appellant and Mr. Harden for the appellee. May it please the court, counsel, I'm Daniel Edelman appearing for Ms. Schellenger. Ms. Schellenger had a Home Depot credit card, good solely for the purchase of goods at Home Depot. Payment is directed to Home Depot Credit Service. She doesn't pay and is sued more than four years after default. The Uniform Commercial Code Section 2-725 provides that an action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. Contract of sale is defined as one relating to the present or future sale of goods. This statute has been construed to include the payment obligation for goods that have been delivered even when there is nothing other than payment left to be done under the contract. That was the holding of the 4th District in Citizens National Bank v. Farmer and the 7th Circuit Court of Appeals in Phillips v. Asset Acceptance. A New Jersey appellate court, the intermediate appellate court of that state, dealing with an identical statute, it is a uniform statute, and an identical credit card, the same Home Depot store credit card, held that the four-year statute of limitations applies to the Home Depot credit card. That was the field decision discussed at length in our briefs. The comment to Section 2-725 states that its purpose is to introduce a uniform statute of limitations for sales contracts, thus eliminating jurisdictional variations, and that four years is a sufficient length of time to resolve any disputes relating to the sale of goods. I have a question. Within the four years, could Home Depot have sued Ms. Schellinger for return of the goods? If the other requirements for that were met, yes. I'm not sure they would have had a security interest or the ability to get specific goods, but if the requirements in the UCC are met, yes. All of the applicable remedies could be resorted to. In fact, from a historical standpoint, originally when stores began issuing store credit cards, there was no third party involved. Both the obligation to pay for the goods and the remedies of the seller were governed by the UCC. That's the Gimbel Brothers case cited in the briefs. The same principle was applied by the Illinois courts in the Johnson v. Sears Roebuck case dealing with a store credit card. The court there held that a store credit card is not subject to the Interest Act or usury regulation because it is the sale of goods to be paid for over time and not a loan subject to interest and usury. There was an identical case in New Jersey which the Thiel case relied upon in deciding that the Home Depot credit card is simply a means of paying for the sale of goods. The issue is raised by the fact that in recent years, stores have contracted with third parties, generally banks, to handle their credit cards. The credit cards do not differ in substance. They are still good only at a particular retailer and can only be used for payment for the sale of goods. What Midland is claiming is that this increased the limitations period from four years to five years. And I submit that there's no logical reason for it. The substance is still payment for the sale of goods governed by a four-year statute. This is not like a general-purpose credit card as was involved in the Harris Trust case. In a general-purpose credit card, the consumer applies at the bank. The consumer does not apply to a bank for a credit card good only at a Home Depot. In the general-purpose credit card, the bank contracts with a Visa or MasterCard network, which contracts directly or indirectly with various merchants and financial institutions that honor the card, so that the consumer can use the general-purpose card for anything, goods, services, go to an ATM and get a cash advance. Let me ask you why the Harris Trust case does not apply in this case. Because it is a totally different relationship. In the Harris Trust relationship, you deal with the bank. The substance of the transaction is an offer to make a loan, which can be used at the consumer's discretion wherever they want. The documentation is quite different from the Harris Trust-type relationship and the present relationship. You do not have a contract between the retailer and the bank contemplating the issuance of credit cards under the retailer's logo usable solely for purchases of goods at the retailer. It's just not the substance of the transaction. The question is, do we have a sale of goods or a general-purpose extension of credit, which can be used for anything? The mere fact that a bank is involved is not determinative. For example, in Citizens National Bank, the contract was immediately assigned to a bank. All payments were made to the bank. At the time the case arose, the only thing left to be done is to pay the bank. The court distinguishes Harris Trust on the ground that this isn't a case where the buyer borrows money from a third party and uses it to purchase goods from a merchant. I submit that the applicable test is, what is the substance of the transaction? Is it a general-purpose extension of credit usable anywhere, or is it a means of payment for the purchase of goods at a specific retailer, which is what we have here? If the card is a general-purpose credit card, the transaction is between the bank and the consumer. Here, the transaction is between Home Depot and the consumer, not the bank. The person goes to Home Depot, wants to buy something. They don't have the money. The retailer proposes this is a means of payment. If you look very carefully in the documentation, you will find a reference to Citibank, but payment is not directed to Citibank. It goes to Home Depot Credit, whatever that is. The person is dealing with Home Depot. The distinction I propose is a very simple one. The documentation involved in the two types of transactions are well-known to the industry and are readily ascertainable. All credit card agreements have to be posted on the government website. They have been since 2009. So that Midland and anyone else knows perfectly well what it is they're getting. If you look at the credit card agreement, you find that it is good only for the purchase of goods at Home Depot. It does not authorize cash advances. It does not authorize its use at any other merchant. So the terms are quite clear and leave no question as to what it can be used for. Midland argues that other obligations under the contract of sale had nothing to do with Citibank. That's actually not true. Since 1974, the issuer of a credit card is subject to claims and defenses good against the merchant at which it's used, any credit card. It's the Fair Credit Billing Provisions of Truth in Lending, 15 U.S. Code 1666. In addition, it's not material. Generally, things like warranties, revocation of acceptance, return of goods that are not paid for, those take place immediately. For example, in the Phillips case, the Seventh Circuit case, the goods were natural gas delivered by pipe. The goods are consumed within seconds after delivery. If anything is wrong with them, it's known immediately. Nevertheless, the court held that the obligation to pay, many years later, is subject to the UCC and governed by the four-year statute. I think it is essential to look at substance rather than form in these transactions. The reason is that in all consumer financial services transactions, you have one side which is intimately familiar with the law and the other side, the consumer, who has absolutely no conception of what it is that, what the legal ramifications are of what they're getting. If a court were to hold that you can, through the nominal involvement of a bank, extend the statute for limitations or otherwise avoid the protection which the legislature has determined should be applicable in this case, namely a four-year statute of limitations, the court can be assured that the industry will take advantage of it. For example, to consider the Citizens Bank case, the retail installment contract for the purchase of a vehicle at a car dealer. What would prevent a car dealer from offering a credit card to a consumer to finance the purchase of a car? The answer is substance over form. What would prevent the dealer, instead of having a retail installment contract, which is assigned to the bank and which is subject to the four-year statute, have the consumer execute a note payable to the bank, signed at the car dealer, together with something authorizing the disbursement of the funds solely to the car dealer for the purchase of a car. The latter is, by the way, the Falimento case, a Seventh Circuit decision cited in our briefs, and the court held this is an evasion. You've got a four-year statute. It's the sale of goods. You cannot get around it by doing the paperwork in this form. We submit that the same rule should be followed in this case. What we have here is a means of paying for the sale of goods, nothing else. The credit obligation serves no other purpose. Therefore, it should be governed by the four-year statute of limitations. Unless Your Honors have some questions, I'll reserve the rest of my time. Thank you. Mr. Hardy? May it please the Court? William Hardy on behalf of the Midland Happily Council. Let me start off by saying I have to disagree vehemently with Mr. Edelman's response to your question. Could Home Depot have sued Ms. Schellinger to get the goods back? The goods were paid for pursuant to a loan under that credit card agreement. They were paid for. Your billing statements make that very clear. In fact, there's no dispute that Schellinger herself understood that she had a contract with Citibank. She said that in response to the complaint when she said that her contract with Citibank was charged off. The credit card agreement is in the record. It was attached to our motion to dismiss. It was attached to an affidavit in support of our reply memorandum as well. And it specifically identifies Citibank. It says that the account means the relationship between you, Schellinger, and us, the issuer of the account, Citibank. We, us, and our is defined as Citibank. You, your, yours mean the person who applied to open the account. It was paid for by Citibank. There's no scenario where Home Depot could come back and get those goods. And that's the problem here. You know, he talked about several cases that were cited in his reply brief. And I want to go through those in some detail because they get to the very heart of this issue, Your Honors. Let me ask you about the case cited by Mr. Edelman and by the Schellinger, which is this good in funding against Thiel in New Jersey. Sure. Is that case authority for us and should we follow it? Well, as we know, out-of-state authority can be relied upon as persuasive, but it's certainly not binding on this court. And I would note that in that case, the court never does what needs to be done here. It doesn't analyze how the UCC could ever apply to the credit card issuer. I mean, what he's saying here is, look, there's got to be a difference between a general-purpose credit card and one that relates only to purchasing for a specific store. Okay. Well, that's a pretty slippery slope because certainly any credit card, whether it's a couple of stores, many stores, you know, you have the credit card system involves an agreement between the merchant and the credit card issuer, an agreement between the consumer and the credit card company. And you can always make that argument in every case that it's, quote, related to a contract for sale of goods. The problem is that there is no scenario in this case. And we point this out in our brief in some detail, which he quite, by using cases that don't apply, kind of dances around. And that is that the UCC could never apply to this situation between Citibank and Schellinger. Citibank didn't sell any goods. Citibank didn't provide any warranties. Citibank provided a loan, just like in the other cases that have been discussed. And, you know, the Thiel case that he talks about in New Jersey, there's no analysis of the UCC other than Section 725. And Section 725, as we point out, you know, and I conclude a rather, you know, detailed discussion in our brief of why the UCC can't possibly apply to this. I mean, 725 is preceded by 24 subsections, the seller's remedies, the buyer's remedies. There's all kinds of them. The definitions include definitions of the seller, of the buyer, of a contract for sale, of a sale, so on and so forth. And, you know, this notion that if it's related to, in some way, it automatically is governed by the UCC, that's not supported by the plain language of the UCC. It has to be considered as a whole. I agree that it is specific as to a contract for sale of goods, Section 725, but it's not specific as to this situation in any fashion whatsoever, nor could it ever be. You know, and we hold, and I just want to go through it, that the contract for sale includes both a present sale of goods and a contract to sell goods at a future time. A sale, quote, sale, unquote, consists in the passing of the title from the seller to the buyer for a price. A present sale means a sale which is accomplished by the making of the contract. Okay, so you're talking about the contract between the seller and the buyer for the goods themselves. This is not an assignment situation like these cases which I'm going to get to in a minute. This is not a situation where the company that is suing is somehow stepping into the shoes of the seller by taking an assignment. That's a completely different situation that's governed by the UCC. Would that account for the way in which pharma is distinguishable? Yes, I think so. I think it absolutely accounts for why pharma is distinguishable. And, you know, the pharma case, well, it's an assignee case. There's no question it was a contract for sale of goods, and it was a straightforward assignee situation which is governed by the UCC. That's provided by the UCC. And so, you know, I want to talk about some of these cases that he mentioned and the cases that you're relying on his reply. Because the cases are like applying apples and oranges. He never really responds to the critical points we make. He says in his reply brief in a couple of points where he starts citing these cases. This is on page 13. Nothing requires a retail transaction to implicate every portion of Article 2. And on the next page, after he cites these four cases, he says Citibank need not have every remedy claim in defense mentioned in Article 2 available to it in order for the transaction to be a contract for the sale of goods. There's no situation where Citibank can sue for breach of a contract for sale. There's no situation where Schellinger can sue Citibank for breach of a contract for sale as contemplated by the UCC. This is a loan just like any other credit card transaction. In these cases, because he cited several of them, I have to go through them. The Phillips v. Asset Acceptance case, the Seventh Circuit case. That was a debt collector trying to collect debt owed to utility companies pursuant to contracts between utility companies and their customers. So the court concluded that the UCC defines natural gas as a good through a plot. Period. Period. And so, therefore, it was a contract for sale of goods between the seller and the buyer. And the buyer, I mean, he's just simply not right about this. If there was something wrong with that natural gas and it damaged a furnace or it damaged a water heater or, you know, it was somehow affected, the buyer would have remedies under the UCC. It's a specific situation where the UCC applies by its plain language. In this Falamento case, I mean, that's even worse. This is a Seventh Circuit case cited on page 14 of the reply brief. But it involved, again, a straightforward dispute between a seller and buyer of goods or successor to the seller. Okay, what happened was the seller sold the buyer supplies for hydraulic cranes and the buyer executed promissory notes, agreed to pay the seller for those supplies. The notes were due 120 days after delivery. But the buyer failed to pay all the amounts due. And the buyer in that case was claiming that the seller breached various contractual warranties relating to the quality and fitness of the goods. The seller, however, the successor to the seller, waited nine years to file suit, well before the four-year statute of limitations period set forth in the UCC. The case has nothing to do with what's happening here. It has nothing to do with the factual scenario that we're dealing with here. The other two cases that he cites, this Massey-Ferguson credit court case, a California case, that was a dispute over a contract for sale for another 510 gas combine sold by Massey-Ferguson to a buyer. The credit corporation plaintiff in that case obtained an assignment of the contract for sale. And after a payment was missed on the contract, they repossessed and resold the combine, which is one of the rights that's all governed by the UCC and so forth. But what happened was then long after that, well beyond the four years, which clearly applied because it was a sale of goods under the UCC, they tried to get a deficiency judgment. And the court said no. I mean, that's a case where there were specific rights. The UCC applied. There's just no question about it. The fourth case that he cites in that section is Ewell v. Transworld, a 2017 Illinois District Court decision. Now, Ewell involved debt collectors suing to collect student loan debt. UCC was never discussed or issued, nor did the case have anything to do with the sale of goods. The only statute of limitations question in that case was whether the 10-year statute for a written contract or a 5-year statute for an oral contract applied. So what I'm saying is he's dancing around the issue here. He cannot identify, and I guarantee you when you look at all these cases that he cited, any situation where the UCC would apply to this situation. It simply doesn't. And again, I for the life of me, and I look through them again. I read through all those provisions that we cite in our brief. And I agree that you have to look at the substance and not the form. But that's exactly what he's avoiding. He's avoiding looking at the substance. The substance of these things are no different than any other credit card transaction like this. And if you apply that logic, then that's related to the sale of goods. Every credit card issuer knows that people go out and they buy goods all the time. If that's the criteria that's somehow related to a contract for sale of goods, well, then you have to extend it to the next level. You can't carve out that exception. And that's the problem with the Thiel case. The Thiel case, they really don't analyze that issue in any detail. And just a few more points about the reply brief. I read many of those cases that he cited in the reply brief last night. He cites a couple of times this Carrillo v. O'Hara case for this very purpose of saying, well, you've got to look at the substance of the transaction, not the form. And he twice relies on that case to basically inject equity into this case. It's a 1948 Illinois Supreme Court case, an equity case. It involved the division of property related to some kind of a business venture of some type. It was not an action in law. It wasn't based on a credit card agreement or anything like that. There's a huge difference between equity and law. Equity is only injected into a case when there's no adequate remedy in law. Here we're talking about statutory interpretation. We're talking about the card agreement. And so those are the types of cases that he's relying on. And those cases just simply do not apply. The Harris Trust case is the seminal case. And that's the case that, and I understand it does not involve a store-specific credit card. But it does involve that same tripartite relationship. And you cannot make the distinction just because it's a store-specific credit card. You can't go down that line. You have to look at the UCC and whether it applies to this situation. And for the life of me, I cannot figure out how, under any circumstances, the UCC would apply to this situation. Now, in his reply brief, he raises for the first point, and we're going to make this point too, that, well, we need to find out what the original document said. You know, we don't have all the documents. He didn't raise that in his opening brief. He opens it, he raises it in his reply brief. We attached the billing statements, the credit card, which contains the agreement, which says this is between Citibank and it's between Challenger. She understood that. So, number one, it's been forfeited. It hasn't been raised. And number two, look, we're going down a fishing expedition here. Because there's no basis for making that distinction between a general-purpose card and a card that only deals with a specific retailer. But there's no dispute what happened here. And, you know, unless the court has any questions, I would just simply reiterate that the Harris Trust case applies. The UCC does not apply. There's no situation where any of the remedies that are discussed in the UCC could possibly apply. And, therefore, the court is right, and there's no reason to disturb this well-established case law or to depart from what I think is the plain language of UCC. Thank you. Thank you, Mr. Harden. Mr. Edelman, you have rebuttal. Midland insists that no, there's no situation where any remedies set forth in the UCC apply against Citibank. That is not true. If you look at 15 U.S. Code 1666, non-delivery of the goods is something that may be raised as a billing error against the issuer of the credit card, Citibank. If you look at 15 U.S. Code 1666i, small i, no parenthesis next to the six, you will find that Citibank or any other issuer of a credit card is subject to claims and defenses which the consumer has with respect to the merchant from which the goods were obtained. So if there's a breach of warranty, the floor and other material obtained from Home Depot is defective, that may be raised against the issuer of the credit card. So that premise is simply not true. What is Citibank's involvement? Other than being the nominal issuer of the card, we do not know. There is nothing in the record which shows, for example, who bears the risk of loss or what the arrangement is between Citibank and Home Depot. They run the whole gamut. In some cases, the bank bears the risk of loss. In some cases, the merchant bears the risk of loss. In many cases, neither bears the risk of loss. The receivables are securitized, and the risk of loss is borne by public or institutional investors. We just don't know. All we know is that if you look carefully enough at the agreement, Citibank is defined as the issuer even though payment is made to Home Depot Credit Services. The field decision has greater status than is generally the case with out-of-state decisions. Why? Because the Uniform Commercial Code is supposed to be uniform. The comment to UCC 2725 says that its purpose is to have a uniformly applied statute of limitations applicable to the sale of goods. Therefore, we think that the field case should be followed. It does recognize substance over form. If the nominal involvement of Citibank, and let's put to one side who actually bears the risk of loss, is sufficient to extend the statute of limitations, then businesses will use this device in every case. One of the things that the Yule case dealt with, and it's a student loan case, but the portion cited deals with what is known as a rent-a-charter or rent-a-bank problem. A bank receives a modest compensation for the injection of its name into a transaction. The court decided that that could be subject to attack. What is really at issue is what is the substantive involvement of the bank. Is this a loan from a bank? Or is it a loan from some private entity not entitled to the privileges of a bank? Same thing applies here. The actual transaction is a sale of goods in the presentation by a merchant of a means for the payment of the goods over time. Nobody goes to Citibank and asks for a Home Depot credit card. It's something that Home Depot originates. The question is, will the court allow the actual drafting of documents to involve a bank to control the actual substance of the transaction? The Seventh Circuit said no in the Falamento case, where the problem was a note was executed, and that could have been done in the Farmer case as well. Don't have a retail installment contract, an assignment, the dealer presents a note and it's paid to the bank and gets the proceeds. Does that make a difference? The Seventh Circuit said no. It doesn't affect the substance of the transaction. The substance of this transaction is the payment for goods over time from Home Depot, and we urge the court to apply the UCC. Thank you, Mr. Edelman. Thank you, Mr. Hardy, for your briefs and arguments, and we'll take them under advisement and render a ruling.